IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAUREEN POWELL, ET AL.         :

         :

    v.                  : Civil Action No. DKC 2006-1198

         :

AEGIS MORTGAGE CORP., ET AL.    :

         :

**MEMORANDUM OPINION**

This case involves allegations of fraud, conversion, breach of contract, and statutory violations against a mortgage broker, settlement company, lenders, insurers, and related persons and entities involved in a real-estate transaction. Four motions are presently pending and ready for resolution in this case. Defendants Aegis Mortgage Corp. (AMC), Aegis Wholesale Corp. (AWC), and Aegis Loan Servicing, Inc. (ALS), move to dismiss, or in the alternative for summary judgment.[1]   (Paper 6).   Three other Defendants also move to dismiss:  Liberty Mutual Insurance Co. ("Liberty") (paper 8), Mortgage Guaranty Insurance Co. (MGIC)

---

[1] Plaintiffs named these Defendants in the caption of the complaint as: Aegis Mortgage Company, Aegis Wholesale Company, and Aegis Mortgage Loan Servicing.  Defendants submit that the actual names of the real parties in interest are Aegis Mortgage Corp., Aegis Wholesale Corp., and Aegis Loan Servicing, Inc., and suggests that the names utilized in this action should be changed accordingly.  (Paper 6, at 1 n.1).  In order to reflect the proper name of the real party in interest under Fed.R.Civ.P. 17(a), the clerk will be directed to amend the docket to reflect the corporate names provided by Defendants AMC, AWC, and ALS.

(paper 12), and Prudential Financial ("Prudential") (paper 40).[2]
The issues are fully briefed and the court now rules pursuant to
Local Rule 105.6, no hearing being deemed necessary.  For the
reasons that follow, the court will dismiss all counts as to ALS,
Liberty, MGIC, and Prudential, Mortgage American Partnership (MAP),
Apple Title of Maryland LLC ("Apple"), and Renard Johnson and will
dismiss one federal claim and all but one of the state law claims
against AMC and AWC.

## I.  Background

The following statement of facts is based on Plaintiffs'
complaint and is presented in the light most favorable to
Plaintiffs.  Plaintiffs completed an intra-family real-estate sale
and associated refinancing in May 2003.  Plaintiff Reginald Vaughn
originally owned the property, at 2616 Lackawanna Court in Adelphi,
Maryland, that was the subject of the sale and refinancing
transaction.  He sold the property to Plaintiffs Maureen Powell,

---

[2] Plaintiffs named Prudential Financial as a Defendant in
their complaint, and also named Liberty Mutual Insurance Company as
a Defendant as a "successor in obligation" to Prudential.  (Paper
1, at 30).  LM Property and Casualty Insurance Company has filed a
motion to dismiss the claims against Prudential, and in its motion
asserts that it is the real party in interest because Prudential
Financial, Inc. never wrote insurance policies, and Prudential
Property and Casualty Insurance Company, which did, is now known as
LM Property and Casualty Company.  (Paper 40, at 1).  Plaintiffs
respond by asking the court to substitute the proper party pursuant
to Fed.R.Civ.P. 19.  (Paper 41, at 1).  Because both parties agree
to such a substitution, the clerk will be directed to add LM
Property and Casualty Company and terminate Prudential and Liberty
Mutual Insurance Company as parties in the docket.

Vaughn's wife, and Adelaide Wiseman, Powell's mother.  Vaughn was having trouble making payments on his mortgage on the property in early 2003 and "[g]iven the favorable interest rates prevailing in early 2003" he decided to sell the property to Wiseman and Powell to get a more favorable interest rate based on their higher credit ratings and to obtain cash.  (Paper 1, at 6-7).

Plaintiffs were referred to MAP, a mortgage broker, and met with Darwin Farmer, an employee of MAP.  Plaintiffs initially contacted Farmer by phone, and later met with him on March 11, 2003.  Farmer checked the credit reports of Plaintiffs Wiseman and Powell on March 11, 2003, and they filled out a mortgage application, but did not receive a copy of the form.  Vaughn told Farmer at this meeting that he wanted to sell the property, which had been appraised at $255,000, for no more than $225,000, in order to keep at least $30,000 of equity in the property and reduce the cost of financing.  Plaintiffs claim that Mr. Farmer told them at this meeting that mortgage financing for the sale would be available at an interest rate of 5.5% and that the total monthly payments for the mortgage would not exceed $1900.  Plaintiffs indicate that "at no time did Mr. Farmer ever provide the Plaintiffs with a Good Faith Estimate . . . describing the terms of the loan, nor the mortgage broker fee or loan origination agreements."  (Paper 1, at 7).  Plaintiffs met with Mr. Farmer again on April 2, 2003, to sign a loan application, but were not

provided a copy of the papers they signed and neither saw nor signed a good faith estimate.  Mr. Farmer scheduled closing of the loan for May 22, 2003, at the offices of Apple, the closing agent. Mr. Farmer also informed Plaintiffs that the financing package he had arranged was only valid through May 21, 2003.  Because Renard Johnson, the principal of Apple, was out of town, the papers for the closing would be signed on May 22, 2003 and back-dated by one day to May 21, 2003.

At the time of the closing on May 22, 2003, Mr. Vaughn spoke by telephone with a representative of a mortgage insurance company, and was informed that the monthly payment on the loan would be more than the anticipated $1900.  Mr. Johnson and Mr. Farmer told Plaintiffs that due to a credit report for Ms. Powell obtained earlier that day, the monthly payments would be $888.63 higher than anticipated due to increased mortgage insurance premiums and a higher interest rate.[3]  Plaintiffs objected to this increase in costs, but were informed that other financing could not be arranged without a significant delay.  Plaintiffs felt acute time pressure to complete the transaction immediately, because, as Plaintiffs had informed Mr. Farmer at their April meeting, Mr. Vaughn's current

---

[3] Plaintiffs allege that the increase in the payment Mr. Vaughn was informed of before the closing was $888.63.  (Paper 1, at 9).  Plaintiffs also allege, however, that the ultimate monthly payment on the loan was $2863, (*id.* at 10), which is $963 higher than the $1900 maximum monthly payment Plaintiffs' allege they were promised.  The relationship between these factual allegations is unclear.

mortgage was under a four-month forbearance that was about to run out, and he was four months behind on his mortgage payments. Plaintiffs also allege that Mr. Johnson and Mr. Farmer told them the deal had to be closed quickly.  As a result, Plaintiffs "signed numerous documents hastily, without either inspecting or understanding them."  (Paper 1, at 9).  At Mr. Farmer's request, Plaintiffs also "sign[ed] several documents that were not filled out" because Mr. Farmer indicated that "he needed additional signatures for new documents."  (*Id.*).  The only documents Plaintiffs were provided at the closing were "temporary payment coupons noting the $2863 monthly payment."  (*Id.* at 10).

After the closing, Plaintiffs sought information about the transaction that had occurred, initially by calling Mr. Johnson. On June 18, 2003, Plaintiffs received a packet of documents from Mr. Johnson, including a document that purported to be the HUD-1 form for the transaction.  This form disclosed several charges associated with the transaction that Plaintiffs allege they were unaware of at the time of the closing.  These charges included: "a $2550 'commission' to one Cedar Hawkins, whom the Plaintiffs had never heard of," (paper 1, at 10); "a 'Loan Origination Fee' of $10,200 to MAP , and a . . . $5418.75 'Loan Discount' to Aegis" (*id.*); escrow payments for four months of hazard insurance totaling 537.95; "a $400 'Broker Processing Fee' to MAP . . ., a $470 'Broker Administration Fee' . . ., and an [sic] $595.50

'Administration Fee' to Aegis," (*id.*); "$90 in 'Courier Fees'" (*id.*) without further explanation; and recording fees and taxes of $65, $1275, $3570, and $1122.[4]   Also included in the packet of documents received by Plaintiffs on June 18, 2003, were a "Uniform Residential Loan Application" that appeared to be dated May 22, 2003; a Private Mortgage Insurance Disclosure characterizing the loan as "Non-High Risk;" and a Tax and Hazard Insurance Record prepared by Apple listing "an annual premium of $884.00, with a monthly escrow amount of $73.67." (*Id.* at 11).   All of these documents were attached to Plaintiffs' complaint as Exhibit B.

On August 18, 2003, Plaintiffs wrote a letter to AMC concerning hazard insurance and other issues related to the loan and complaining about the change in the loan terms and the process by which the loan documents were prepared and executed.   On September 19, 2003, AMC responded and provided Plaintiffs with a copy of a good faith estimate form "prepared by MAP and purported [sic] signed by the Plaintiffs, supposedly on April 2 2003 [sic]." (Paper 1, at 12).   This document "sets forth a Loan Origination Fee of $3550, a Mortgage Broker fee of $5100, each substantially lower than those actually charged." (*Id.*).   It also lists escrow amounts at settlement including:   "hazard insurance of $35 per month for 3

---

[4] Plaintiffs allege that the payment to Cedar Hawkins may be fictitious, as no real estate broker by this name is listed in the records of the Maryland Real Estate Commission. (Paper 1, at 15 & Ex. I).

months, mortgage insurance of $163 per month, and six months of taxes at $150 per month." (*Id.*). AMC's representative, Mr. Andrew J. Sutton also "reassured Plaintiffs Powell and Wiseman that funds were being escrowed." (*Id.*). Plaintiffs were also provided with a copy of a Mortgage Brokerage Contract purportedly signed by them on April 2, 2003, setting the amount of the loan at $255,000. Plaintiffs allege that they would not have agreed to the loan in this amount. It also sets brokerage fees of $8520, which is higher than the fee indicated in the HUD-1 form, and indicates a monthly payment of $1447.68. Mr. Sutton told Plaintiffs that "'it was the subsequent discovery of your derogatory credit information that caused the interest rate to rise to 7% and cause [sic] fees associated with your loan to increase'." (*Id.*).

Mr. Sutton also enclosed with his response a copy of a homeowner's insurance policy declaration page purportedly issued by Prudential that did not have any policy number on it, but had been executed by "Michael Greentree" and listed a coverage period of April 25, 2003 through April 25, 2004, at a premium of $884. Finally, Mr. Sutton enclosed with his reply letter a "Mortgage Guaranty Commitment Certificate executed by Kevin Brady, who Plaintiffs allege is an agent of either AMC or AWC, classifying Plaintiffs as an "'A- credit risk.'". (*Id.*). Other than providing the declaration page, AMC, AWC, and ALS took no other action to investigate whether Plaintiffs' escrow payments were being used to

pay for insurance premiums, or to correct any deficiency in this process.

On August 1, 2003, Ms. Powell was informed by Ms. Jo Throckmorton, an employee of AMC, that the property was insured under a policy issued by Prudential.  Ms. Throckmorton gave Ms. Powell a phone number for Mr. Greentree, who had executed the insurance paperwork, but the number was not in service.  Ms. Powell also requested a copy of her insurance policy from AMC, but never received any other papers related to the policy.  Mr. Vaughn contacted Prudential, and was informed that it had not issued any hazard insurance policy for the Plaintiffs.  Between September 18 and September 20, 2003, Hurricane Isabel caused significant damage to the property.  Plaintiffs sought to file hazard insurance claims for this damage, but were not able to file a claim.  Liberty informed Plaintiffs on May 18, 2005 that neither it nor Prudential had ever written a hazard insurance policy for Plaintiffs' property, and Prudential similarly declared in June 2005 that it had never written such a policy.

In December 2003, Plaintiffs contacted Apple to inform it that they intended to remortgage their home through another mortgage settlement company.  When that company contacted Apple, however, it encountered allegedly unreasonable delays "which, upon information and belief, resulted from Apple Title's reluctance to permit the Plaintiffs to refinance their home . . . ."  (Paper 1, at 14).

8

This delay resulted in Plaintiffs' making higher mortgage payments than they otherwise would have made.  Plaintiffs also allege that they learned from documents disclosed during the refinancing that AMC, AWC, or ALS collected escrow payments in excess of property taxes actually paid, and they contend that the remaining funds were never returned.

Ms. Powell sent a second letter to AMC on July 29, 2005, indicating her belief that "the hazard insurance policy had never existed and that Plaintiffs Powell and Wiseman had never received a refund of the premiums paid for the nonexistent policy." (Paper 1, at 15).  Plaintiffs received a response on August 19, 2005, that allegedly failed to address these issues, but indicated that AMC had requested an explanation from Apple as to the four-month escrow for insurance premiums indicated in the loan documents.  Plaintiffs contend that Apple never responded to AMC's letter.

Plaintiffs filed a *pro se* complaint on May 12, 2006, alleging a total of twenty-three counts against nine defendants: AMC, AWC, ALS, MAP, Liberty, Prudential, MGIC, Apple, and Johnson.[5]  Six

---

[5] Liberty contends that Plaintiffs violated Local Rule 102.1(a)(ii), which requires that "Attorneys who have prepared any documents which are submitted for filing by a *pro se* litigant must be members of the Bar of this Court and must sign the document, state their name, address, telephone number and their bar number assigned by this Court."  Liberty argues that Plaintiffs violated this rule because Thomas C. Willcox, who now represents Plaintiffs in this case, assisted Plaintiffs in drafting the complaint but was not a member of this court's bar and did not sign the complaint. (Paper 8, at 3-4).  Mr. Willcox has since been admitted to this court's bar, and he has filed an appearance on behalf of
(continued...)

Defendants have moved for dismissal or summary judgment as to all counts against them.  Two others, Apple and Johnson, have filed an answer to the complaint (paper 4), and the final Defendant, MAP has not yet been served.[6]  Count I claims a violation of the Real-Estate Settlement Procedures Act of 1974, as amended, (RESPA), 12 U.S.C. §§ 2601-2617, against AMC, AWC, and ALS.  Counts II through VI allege violations of the Maryland Consumer Protection Act (MCPA), Md. Code Ann., Com. Law § 13-101, *et seq.*, against MAP, Apple, AMC, AWC, ALS, Prudential, and MGIC.  Counts VI through XI claim fraud against the same seven Defendants.  Counts XII and XIII assert claims for conversion against MAP, Apple, Johnson, AMC, AWC, and ALS.  Counts XIV and XV claim breach of contract against Prudential and Liberty.  Counts XVI through XX assert claims for negligence against MAP, Apple, AMC, AWC, ALS, Prudential, and MGIC.  Count XXI asserts violations of the Truth in Lending Act (TILA), 15 U.S.C. § 1631, *et seq.*, against AMC, AWC, ALS, and MAP.  Count XXII charges conspiracy against Johnson, Apple, and MAP, and Count XXIII

---

[5](...continued)
Plaintiffs, (paper 17), thus rectifying any harm caused by any earlier violation of the local rules.  The argument advanced by Liberty, that any violation of Local Rule 102.1(a)(ii) rendered the complaint and subsequent service invalid, is without merit.

[6] Plaintiffs have not yet completed service on MAP.  Plaintiff has executed service through the Maryland Secretary of State, but is awaiting the close of a 120 day period after which the Secretary of State will certify that MAP has been served.  (Paper 43, at 1).  The effective date of the summons served on MAP has been extended through the end of this 120 day period.  (Paper 44).

alleges that the same Defendants aided and abetted the deception of Plaintiffs.

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Accordingly, a 12(b)(6) motion ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

In its determination, the court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff.    *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).  The court must disregard the contrary allegations of the opposing party. *See A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969).  The court need not, however, accept unsupported legal

11

allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

Defendants AMC and AWC raise a statute of limitations defense with respect to Plaintiffs' TILA claims.  The statute of limitations is an affirmative defense that a party typically must raise in a pleading under Fed. R. Civ. P. 8(c) and is not usually an appropriate ground for dismissal.  *See Eniola v. Leasecomm Corp.*, 214 F.Supp.2d 520, 525 (D. Md. 2002); *Gray v. Mettis*, 203 F.Supp.2d 426, 428 (D. Md. 2002).  However, dismissal is proper "when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem, North Carolina*, 85 F.3d 178, 181 (4th Cir. 1996).  *See* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357, at 714 (3rd ed. 2004) ("A complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief is the most common situation in which the affirmative defense appears on the face of the pleading and provides a basis for a motion to dismiss under Rule 12(b)(6).").

## III. Claims Against ALS

Defendant ALS moves to dismiss or in the alternative for summary judgment as to all claims alleged against it.  ALS is named

as a Defendant, along with AMC and AWC, in counts I (RESPA), IV
(MCPA), IX (fraud), XII (conversion), XIII (conversion), XVIII
(negligence), and XXI (TILA).  Plaintiffs concede that "[o]n review
of the Motion to Dismiss, the Plaintiffs do not dispute that Aegis
Loan Servicing is not a proper party to this action, and that the
'Aegis Defendants' are properly defined as Aegis Mortgage Company
and Aegis Wholesale Company." (Paper 20, at 1 n.1).  As a result,
all claims against ALS will be dismissed.

## IV.  RESPA Claims

Plaintiffs assert a claim under RESPA, in count I of the
complaint, against AMC and AWC, for "failing to make corrections in
Plaintiffs' account or conduct any genuine investigation concerning
the hazard insurance discrepancy in response to Plaintiff Powell's
August 18, 2003 and July 19, 2005 letters." (Paper 1, at 16).  In
general, RESPA requires a lender to respond to qualified borrower
inquiries regarding the servicing of a covered loan, as provided in
12 U.S.C. § 2605(a):

> If any servicer of a federally related
> mortgage loan receives a qualified written
> request from the borrower (or an agent of the
> borrower) for information relating to the
> servicing of such loan, the servicer shall
> provide a written response acknowledging
> receipt of the correspondence within 20 days
> (excluding legal public holidays, Saturdays,
> and Sundays) unless the action requested is
> taken within such period.

The term "servicing" is defined in 12 U.S.C. § 2605(i)(3), to mean
"receiving any scheduled periodic payments from a borrower . . .,

13

including amounts for escrow accounts described in section 2609 of
this title, and making the payments . . . with respect to the
amounts received from the borrower as may be required pursuant to
the terms of the loan."

A lender is required, under 12 U.S.C. § 2605(e)(2), to respond
to qualifying borrower inquiries within 60 days with appropriate
investigation and corrective action:

> Not later than 60 days (excluding legal public
> holidays, Saturdays, and Sundays) after the
> receipt from any borrower of any qualified
> written request under paragraph (1) and, if
> applicable, before taking any action with
> respect to the inquiry of the borrower, the
> servicer shall--
> (A) make appropriate corrections in the
> account of the borrower, including the
> crediting of any late charges or penalties,
> and transmit to the borrower a written
> notification of such correction (which shall
> include the name and telephone number of a
> representative of the servicer who can provide
> assistance to the borrower);
> (B) after conducting an investigation,
> provide the borrower with a written
> explanation or clarification that includes--
> (i) to the extent applicable, a
> statement of the reasons for which the
> servicer believes the account of the borrower
> is correct as determined by the servicer; and
> (ii) the name and telephone number
> of an individual employed by, or the office or
> department of, the servicer who can provide
> assistance to the borrower; or
> (C) after conducting an investigation,
> provide the borrower with a written
> explanation or clarification that includes--
> (i) information requested by the
> borrower or an explanation of why the
> information requested is unavailable or cannot
> be obtained by the servicer; and

14

> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

The statute, in 12 U.S.C. § 2605(b), defines a "qualified written request," which triggers such a duty to investigate and correct, as:

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

AWC argues that it is entitled to dismissal of Plaintiffs' RESPA claims because RESPA applies only to loan servicers and that, based on the loan documents attached to Plaintiffs' complaint, it was the original lender but not the servicer for Plaintiffs' loan. The inquiry response requirements of section 2605(e)(2) apply only to a loan "servicer," a term defined in 12 U.S.C. § 2605(i)(2) as "the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)." The RESPA allegations in Plaintiffs' complaint contend that "Aegis" committed the violation, and Plaintiffs define this term to include both AWC and AMC. (Paper 1, at 16). Although Ms. Powell's letters were directed only to AMC, (paper 1, Ex. D, Ex.

K), a document attached to the complaint indicates that AWC transferred the servicing duties with respect to Plaintiffs' loan to AMC as of July 1, 2003, more than a month after the date of the closing. (Paper 1, Ex. B, at 31). In addition, the initial statement for Plaintiffs' escrow accounts, as of the date of the closing, was issued by AWC. (Paper 1, Ex. B, at 7). Dismissal of Plaintiffs' RESPA claim with respect to AWC is not warranted, because it does not appear "beyond doubt that the [P]laintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley*, 355 U.S. at 45-46. The loan documents attached to the complaint are not a sufficient basis for dismissal because they do not establish whether AWC was responsible for servicing Plaintiffs' loan prior to July 1, 2003.

AMC and AWC also contend that Plaintiffs have failed to state a claim because they have not filed a qualifying request under RESPA. Plaintiffs contend in the complaint that the letters sent to AMC by Ms. Powell on August 18, 2003, (paper 1, Ex. C) and July 19, 2005, (paper 1, Ex. K) constitute qualifying requests. Both of these letters were attached to and relied upon in Plaintiffs' complaint. It is therefore appropriate to consider these documents on a motion to dismiss. *See Abadian,* 117 F.Supp.2d at 485. AMC and AWC contend that these letters relate to the loan's terms and the circumstances of the closing rather than to the servicing of the loan.

16

In the August 18 letter, Ms. Powell complained to AMC about various aspects of her loan and the process through which it was executed, including: lack of documentation at closing, procedures and notice provided at closing, lack of a good faith estimate, excessive loan fees charged at the closing, differences between the interest rate charged and that promised by the mortgage broker, allegedly outrageous charges for mortgage insurance, escrow payments collected at settlement for hazard insurance that did not exist, and discrepancies between monthly mortgage insurance payments and the charges anticipated by Plaintiffs. (Paper 1, Ex. C).  With respect to escrow charges for hazard insurance, Ms. Powell complained that "there was no hazard insurance policy protecting my home, despite the fact that funds were clearly taken out for such a policy at settlement." (Paper 1, Ex. C, at 3).  Ms. Powell also inquired about whether $884 was currently due for an insurance policy issued by Prudential, whether such a policy existed, and to what extent her payments were being applied to purchase such a policy.  (*Id.*)  While she did not explicitly indicate whether she believed hazard insurance premiums were still being incorrectly collected in an escrow account or reference the term servicing, her assertion raises an issue of whether her account was correctly credited for escrow payments she had made at the time of closing.  As a result, it may constitute "a statement of the reasons for the belief of the borrower . . . that the

17

account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower" as required by 12 U.S.C. § 2605(b), and the letter may constitute a qualified written request as defined in that section.[7]

AMC and AWC argue that the rationale expressed in *MorEquity, Inc. v. Naeem*, 118 F.Supp.2d 885, 901 (N.D.Ill. 2000), *reconsideration denied*, NO. 99C735, 2001 WL 1426518 (Feb. 8, 2001), supports a holding that Ms. Powell's letter is not a qualified written request because it did not address Plaintiffs' account balance or other issues relating to servicing the loan. In *MorEquity*, the court held that a letter "alleg[ing] a forged deed, and irregularities with respect to the recording of . . . two loans" did not constitute a qualified written request because the complaint did not allege that it "relate[d] in any way to the 'servicing' of the loan, as that term is defined in the statute. . . . . [T]he letter sought information about the validity of the loan and mortgage documents, but made no inquiry as to the status of the Naeem account balance." *Id.* Ms. Powell's August 18, 2003 letter, however, is distinguishable because it refers to payments made to AMC or made into escrow for mortgage and hazard insurance, and thus does concern Ms. Powell's account balance for this escrow account.

---

[7] As a result of this conclusion, it is not necessary to decide at this time whether Ms. Powell's later letter could also constitute a qualified written request under RESPA.

AMC and AWC also argue that the exhibits attached to the complaint indicate that they replied to Ms. Powell's August 18, 2003, and July 29, 2005 letters in compliance with any obligations under RESPA.   The documents they refer to were attached to Plaintiffs' complaint as Exhibits D, E, F, G, H, and M.   Therefore, as discussed above, these materials may properly be considered on a motion to dismiss, and the motion by AMC and AWC need not be converted to a motion for summary judgment.   RESPA, in 12 U.S.C. § 2605(e)(2)(B)-(C) requires lenders not only to respond to a qualified written request within 60 days but also, after conducting an investigation, to provide the borrower with a written explanation including "to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; . . . [or] information requested by the borrower or an explanation of why the information requested is unavailable . . . ."

The materials provided to Plaintiffs by AMC in response to Ms. Powell's August 18, 2003 letter include a responsive letter written by Mr. Andrew J. Sutton (paper 1, Ex. D), a copy of a good faith estimate purportedly for Plaintiffs' loan (paper 1, Ex. E), a mortgage broker contract purporting to bear Plaintiffs' signatures (paper 1, Ex. F), a declarations page for a homeowner's insurance policy (paper 1, Ex. G), and a Mortgage Insurance Commitment Certificate issued by MGIC (paper 1, Ex. H).   With respect to insurance, Mr. Sutton's letter asserts that "I have enclosed a copy

19

of the Prudential Financial Homeowners Policy Declarations as well
as the Initial Escrow Account Disclosure Statement.   Funds for
insurance were being reserved and are being escrowed so that the
lender has the funds available to keep the policy current for you."
(Paper 1, Ex. D, at 2).   Plaintiffs allege that the hazard
insurance declarations page provided by AMC was invalid because it
lacked a policy number, that such a policy was never issued, and
that AMC and AWC failed to conduct an adequate investigation of the
purchase of hazard insurance for the property in response to Ms.
Powell's letter.   (Paper 1, at 13-16).   The documentation and
letter provided to Plaintiffs by AMC and attached to the complaint
do not demonstrate that the response by AMC and AWC to the
allegations in Ms. Powell's letter was undoubtedly adequate under
RESPA.   Thus, they do not show that Plaintiffs could prove no set
of facts under which they would prevail, and AMC has not
established adequate grounds for dismissal of this claim.

**V.   TILA Claims**

Plaintiffs assert claims under TILA against AMC, AWC, and MAP.
TILA, 15 U.S.C. § 1631, *et seq.*, establishes disclosure
requirements applicable to lenders in consumer credit transactions.
Under 15 U.S.C. § 1638, which governs transactions that are not
open-ended, creditors are required to disclose a list of specific
loan terms to borrowers.   Plaintiffs assert that AMC, AWC, and MAP
"failed to disclose to the Plaintiffs *inter alia*, the proper amount

financed." (Paper 1, at 36). Creditors are required, under 15 U.S.C. § 1638(a)(2)(A) to disclose "[t]he 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use."[8] Pursuant to 15 U.S.C. § 1640(a), a borrower who has not received notice required by TILA, including section 1638, may initiate a civil action for monetary damages. The limitations period for such an action, pursuant to 15 U.S.C. § 1640(e) is one year from the date of the violation. Pursuant to 15 U.S.C. § 1635(a)&(f) borrowers in certain transactions have a right of rescission, and this right of rescission may be exercised, when it is otherwise available, up to three years after the closing of a loan transaction, if the creditor remains in violation of the disclosure provisions of TILA.

AMC and AWC argue that Plaintiffs' claims for monetary damages under TILA are barred by the one-year limitations period, and that Plaintiffs are not entitled to a rescission remedy because they did not request rescission in the manner required by the statute within

---

[8] It is not clear which of the disclosures required under TILA Plaintiffs allege were missing, other than the amount financed. The complaint contends that AMC, AWC, and MAP "failed to disclose to the Plaintiffs, *inter alia*, the proper amount financed." (Paper 1, at 36). Plaintiffs also highlight in the complaint that TILA requires disclosure of the finance charge, the annual percentage rate and the borrower's right to rescission. (*Id.*). Although they do not specifically allege that these aspects were missing in the TILA section of the complaint, facts alleged elsewhere in the complaint might support such allegations. Resolution of this issue is unnecessary, because, as discussed further below, Plaintiffs' TILA claims are time barred and will be dismissed.

three years after the closing of the loan.  Plaintiffs allege that AMC, AWC, and MAP violated TILA by failing to disclose required terms of the mortgage undertaken by Plaintiffs at the closing, on May 22, 2003.  Plaintiffs filed this action on May 12, 2006, more than one year later.  As a result, based on the face of Plaintiffs' complaint, any action for monetary damages authorized by section 1640(a) is time-barred under the terms of section 1640(e).

Plaintiffs argue that they are entitled to rescission of the loan under TILA.  Under 15 U.S.C. § 1635(a), a borrower exercises any right of rescission "by notifying the creditor, in accordance with regulations of the Board, of his intention to do so."  The Securities and Exchange Commission regulations governing TILA provide further guidance as to how a right of rescission is exercised:

> To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication.  Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business."

12 C.F.R. § 226.23(a)(2).  Plaintiffs' argument fails because Plaintiffs have not provided Defendants with a written notice of rescission as required by regulation section 226.23(a)(2).

Plaintiffs argue, citing *Taylor v. Domestic Remodeling, Inc.*, 97 F.3d 96 (5th Cir. 1996), that a lawsuit seeking rescission can constitute adequate written notice of an intent to exercise a right

of rescission.   In *Taylor*, the court held that the filing of a complaint explicitly seeking rescission was adequate written notice under regulation section 226.23(a)(2).   *Id.* at 100.   That ruling has never been adopted in this circuit.   The United States Court of Appeals for the Fourth Circuit reasoned, however, in an unpublished disposition, that even if such a rule were adopted, a suit in which the complaint did not explicitly request rescission would not constitute notice of rescission under TILA.   *Jones v. Saxon Mortgage, Inc.*, No. 97-2215, 1998 WL 614150, at *4-*5 (4th Cir. Sept. 9, 1998) (Unpublished Disposition).

The Fourth Circuit's reasoning in *Jones* also applies in this case, because Plaintiffs' complaint does not explicitly mention rescission with respect to the TILA claims.   Plaintiffs alleged only that they were entitled under TILA to "statutory damages, and attorneys fees, awarded jointly and severally among the Defendants, and any other relief this court deems proper." (Paper 1, at 36). Plaintiffs' demand for "any other relief this court deems proper" is not sufficiently specific to give Defendants notice of Plaintiffs' intent to exercise a right of rescission as required by 15 U.S.C. § 1635(a) and 12 C.F.R. 226.23(a)(2).   Plaintiffs' complaint cannot serve as adequate notice, and as a result, Plaintiffs cannot assert a claim for rescission.   Because Plaintiffs' claims for monetary damages under TILA are barred by the one-year statute of limitations, as discussed above, Plaintiffs

23

have failed to plead any TILA claim upon which relief can be granted.[9]  Dismissal of count XXI is therefore appropriate.[10]

## VI.  Supplemental Jurisdiction Over State Law Claims

Defendants Liberty and Prudential argue that this court lacks supplemental subject matter jurisdiction over the claims asserted against them, all of which arise under state law.  This argument raises a substantial question as to this court's subject matter jurisdiction over all of the state law claims asserted against all defendants in this action.[11]

A district court possesses supplemental jurisdiction to hear state law claims that form part of the same case in which another claim raises a federal question.  The outer limit of this standard is set by 28 U.S.C. § 1367(a).  "Pursuant to § 1367(a), when a plaintiff has alleged both federal and state claims, a district

_____

[9] AMC and AWC also contend that Plaintiffs' argument as to rescission fails because the complaint was not served upon either of them until after the three-year period for rescission expired. It is not necessary to reach this issue in order to decide this motion because Plaintiffs never provided adequate notice of their intention to exercise a right of rescission under TILA.

[10] Plaintiffs also name MAP as a Defendant in count XXI.  MAP has not yet been served and has not moved to dismiss.  Plaintiffs' TILA claim will be dismissed as to all Defendants, however, because the statute of limitations defense presents an identical legal issue with respect to all Defendants and applies with equal force to Plaintiffs' claims against MAP.

[11] As will be explained, the court will dismiss all but one of the state law claims, either because the court lacks supplemental subject matter jurisdiction or declines to exercise discretion to retain jurisdiction.  Thus, the motions filed by Liberty and Prudential (papers 8 and 40) will be granted in part.

court may exercise supplemental jurisdiction over the state claims
if they form 'part of the same case or controversy' as the federal
claim." *Eriline Co., S.A. v. Johnson*, 440 F.3d 648, 653 (4th Cir.
2006).  Section 1367(a) provides that:

> Except as provided in subsections (b) and (c)
> or as expressly provided otherwise by Federal
> statute, in any civil action of which the
> district courts have original jurisdiction,
> the district courts shall have supplemental
> jurisdiction over all other claims that are so
> related to claims in the action within such
> original jurisdiction that they form part of
> the same case or controversy under Article III
> of the United States Constitution.  Such
> supplemental jurisdiction shall include claims
> that involve the joinder or intervention of
> additional parties.

"[W]hether the federal-law claims and State-law claims are part of
the same case is determined by whether they 'derive from a common
nucleus of operative fact' and are 'such that [a plaintiff] would
ordinarily be expected to try them all in one judicial
proceeding.'" *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 615
(4th Cir. 2001) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S.
343, 349 (1988)).

Section 1367(c) provides a district court with discretion to
decline supplemental jurisdiction under some circumstances:

> The district courts may decline to exercise
> supplemental jurisdiction over a claim under
> subsection (a) if--
> (1) the claim raises a novel or complex issue
> of State law,
> (2) the claim substantially predominates over
> the claim or claims over which the district
> court has original jurisdiction,

> (3) the district court has dismissed all
> claims over which it has original
> jurisdiction, or
> (4) in exceptional circumstances, there are
> other compelling reasons for declining
> jurisdiction.

The Supreme Court of the United States has interpreted this language to provide district courts with broad discretion to determine when the exercise of supplemental jurisdiction is appropriate for an individual case.

> Depending on a host of factors, then-including
> the circumstances of the particular case, the
> nature of the state law claims, the character
> of the governing state law, and the
> relationship between the state and federal
> claims-district courts may decline to exercise
> jurisdiction over supplemental state law
> claims. The statute thereby reflects the
> understanding that, when deciding whether to
> exercise supplemental jurisdiction, "a federal
> court should consider and weigh in each case,
> and at every stage of the litigation, the
> values of judicial economy, convenience,
> fairness, and comity."

*City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997).

There is some dispute as to whether a district court, when exercising its discretion to decline to exercise supplemental jurisdiction, must rely on one of the four criteria listed in section 1367(c)(1)-(4) or whether it may alternatively rely on the criteria set forth in *City of Chicago.* The United States Court of Appeals for the Fourth Circuit has not addressed this issue. Before *City of Chicago* was decided, some courts held that reliance

on one of the four criteria listed in section 1367(c) was required. *See Executive Software N. Am., Inc. v. United States District Court for the Cent. Dist. of Cal.*, 24 F.3d 1545, 1556-57 (9th Cir. 1994). At least one court also reached this view more recently. *Tinius v. Carroll County Sheriff Dep't*, 255 F.Supp.2d 971, 977-78 (N.D. Iowa 2003). However, the Supreme Court appears to have set out broader criteria upon which a district court may rely in determining whether to exercise supplemental jurisdiction. *City of Chicago*, 522 U.S. at 173. It is unnecessary to resolve this question in order to decide whether to exercise supplemental jurisdiction in this case because it would be appropriate to decline jurisdiction based either on the *City of Chicago* factors or because the state law claims predominate over the federal claims under section 1367(c)(2).

The United States Court of Appeals for the Fourth Circuit has clarified the circumstances under which two of the rationales for declining supplemental jurisdiction, enumerated in 28 U.S.C. § 1367(c)(2) & (3), may be applicable. "The determination of whether a state claim predominates [under 28 U.S.C. § 1367(c)(2)] is not grounded in dollars and cents; the district court, when exercising its discretion, is invoking the abstention doctrine and must address federalism concerns about avoiding federal overreaching into highly specialized state enforcement or remedial schemes." *White v. County of Newberry, S.C.*, 985 F.2d 168, 172 (4th Cir. 1993)

(citing *Burford v. Sun Oil Co.*, 319 U.S. 315, 326-34 (1943)).  The

Fourth Circuit has also observed that:

> trial courts enjoy wide latitude in
> determining whether or not to retain
> jurisdiction over state claims when all
> federal claims have been extinguished. . . .
> Among the factors that inform this
> discretionary determination are convenience
> and fairness to the parties, the existence of
> any underlying issues of federal policy,
> comity, and considerations of judicial
> economy. . . . The doctrine of supplemental
> jurisdiction "thus is a doctrine of
> flexibility, designed to allow courts to deal
> with cases involving pendent claims in the
> manner that most sensibly accommodates a range
> of concerns and values."

*Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (quoting

*Carnegie-Mellon Univ.*, 484 U.S. at 350).

When a claim is dismissed due to lack of supplemental subject

matter jurisdiction or because the district court elects not to

exercise supplemental jurisdiction over that claim, section 1367(d)

provides a mechanism to toll any limitations period to allow such

a claim to be filed again in state court:

> The period of limitations for any claim
> asserted under subsection (a), and for any
> other claim in the same action that is
> voluntarily dismissed at the same time as or
> after the dismissal of the claim under
> subsection (a), shall be tolled while the
> claim is pending and for a period of 30 days
> after it is dismissed unless State law
> provides for a longer tolling period.

As initially pled, Plaintiffs' TILA claims alleged that ALS,

AMC, AWC, and MAP failed, at the time of the closing to make

adequate disclosures of finance charges, amounts financed, the right of rescission, and the annual percentage rate of interest for the loan as required by TILA. (Paper 1, at 36). Plaintiffs also allege that these Defendants failed to respond adequately to Ms. Powell's letters of complaint and inquiry, as required by RESPA. (Paper 1, at 16). Plaintiffs' TILA claims will be dismissed, however, and Plaintiffs' RESPA claims assert only a failure to investigate and respond to complaint letters. Thus, the federal claims going forward in this case will focus on AMC and AWC's actions after August 18, 2003, the date of Ms. Powell's first complaint letter. Whether supplemental jurisdiction can be exercised under section 1367(a) is analyzed based on the complaint as originally filed, *see Hagans v. Lavine*, 415 U.S. 528, 542 (1974), *superceded by statute on other grounds as recognized by* 248 F.3d 175, 191 n.10 (3rd Cir. 2001), and this analysis includes Plaintiffs' TILA allegations, which focus on whether certain disclosures were made at the time of the closing. For the reasons discussed below and based on the limited nature of the federal claims going forward, the court will exercise supplemental jurisdiction over only one aspect of one of Plaintiffs' state law claims.

## A.  MCPA, Negligence, and Fraud Claims

Plaintiffs allege that MAP, Apple, AMC, AWC, ALS, Prudential, and MGIC violated the MCPA, Md. Code Ann., Com. Law § 13-101, *et*

*seq*. Md. Code Ann., Com. Law § 13-301 prohibits, among other things, misleading representations and deceptive omissions of material fact relating to covered transactions. Plaintiffs allege in counts II-IV that MAP, Apple, AMC, and AWC violated the MCPA through misleading statements before the closing, misleading procedures and omissions at the time of the closing, and misleading failure to produce documents related to the transaction within a reasonable time after the closing. (Paper 1, at 17-22). Plaintiffs allege fraud against the same Defendants in counts VII-IX of the complaint. The alleged bases for these claims are nearly identical to Plaintiffs' allegations against these Defendants under the MCPA. (Paper 1, at 23-27). Plaintiffs also assert negligence claims against the same subset of Defendants in counts XVI-XIX. Plaintiffs' allegations as to negligence are also virtually identical to their MCPA and fraud allegations against these Defendants, and the factual focus of the allegations are on conduct before, at, and immediately after the closing. (Paper 1, at 31-34).

As an initial matter, this court may well lack supplemental jurisdiction over these claims. There is some factual overlap between the facts relevant to Plaintiffs' TILA claims, whether the interest rate, amount financed, annual percentage rate, and rescission rights were disclosed to Plaintiffs at the closing, and Plaintiffs' claims of deception and negligence in failing to

disclose or misleadingly presenting various aspects of the loans. The facts relevant to the state claims are, however, significantly different from those relevant to the federal TILA claims. Plaintiffs' state claims focus on the use of funds allocated in the purported HUD-1 form, allegedly misleading statements about what the interest rates would be before the closing, and allegedly misleading practices at the closing, in addition to non-disclosure of basic information required by TILA.  It is not necessary to decide if this factual overlap constitutes a common nucleus of operative fact, however, because it is appropriate under the circumstances to decline any supplemental jurisdiction that may exist over all but one aspect of these state law claims.

Based on the factors identified by the Supreme Court, "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims," *City of Chicago*, 522 U.S. at 173, dismissal of Plaintiffs' state claims is appropriate.  First, as will be discussed further below, this court does not have supplemental jurisdiction to hear some of Plaintiffs' state law claims.  Judicial efficiency is best served if all of Plaintiffs' related state law claims are tried together in state court, rather than combining some of them with unrelated federal claims before this court.  Furthermore, the continuing federal claims, under RESPA, have little factual overlap with Plaintiffs'

MCPA, negligence, and fraud claims, and these federal and state claims do not share any common nucleus of operative fact. The state law claims will be determined by the Defendants' conduct before, at, and immediately after the closing, while the federal RESPA claims will turn only on the subsequent investigation by AMC and AWC into Ms. Powell's letters of complaint. The procedural circumstances of the case also weigh in favor of declining supplemental jurisdiction over the state claims, because the case is at a very early stage. Not all Defendants have been served, only two Defendants have answered, and discovery has not yet begun. Given this early posture and the lack of factual overlap, judicial efficiency and the relationship between the state and federal claims weigh in favor of separating the unrelated claims, especially because no federal claims are asserted against many of the Defendants.

Federalism and comity, identified by the Fourth Circuit in *White*, 985 F.2d at 172, as the core of the predominance inquiry under section 1367(c)(2), also weigh in favor of dismissal. Plaintiffs' state law claims require the joinder of Maryland Defendants, MAP and Apple, under state law claims that are factually unrelated to the federal RESPA claims that will be litigated before this court. Depending on the relationship to Plaintiffs' TILA claims, such jurisdiction could be authorized by section 1367(a), but its exercise impedes the interest of Maryland

courts in settling disputes among its citizens that arise under state law.  Because the state law claims are factually unrelated to the continuing federal RESPA claims; are broader in terms of the factual allegations, the number of Defendants, and the scope of discovery that will be required; and relate to the enforcement of the state's statutory scheme for consumer protection, comity and federalism weigh heavily in favor of declining supplemental jurisdiction.  Furthermore, because at least one of Plaintiffs' state law claims cannot be the subject of this court's supplemental jurisdiction, comity, federalism, and efficiency will be best served by declining to exercise supplemental jurisdiction over all of Plaintiffs' state law claims to the extent they do not allege mishandling of Ms. Powell's complaint letters.

On the other hand, this court will exercise supplemental jurisdiction over one aspect of Plaintiffs' negligence claim against AMC and AWC.  This claim alleges negligence in failing to disclose facts about the loan both before and after it was made. To the extent that Plaintiffs allege that AMC or AWC was negligent in failing to respond adequately to Ms. Powell's letters of complaint, this court will retain supplemental jurisdiction over the negligence allegations.  Any inquiry into such negligence will focus on the same facts, AMC and AWC's investigation of Plaintiffs' complaint letters, upon which Plaintiffs' RESPA claims will depend. Therefore, this limited group of state claims arise from a nucleus

of operative fact common to Plaintiffs' RESPA claims.  Plaintiffs other negligence claims against AMC and AWC, however, focus on the circumstances before and immediately after the closing, and do not overlap factually with the RESPA claims.  Therefore supplemental jurisdiction over these claims will be declined, for the reasons set forth above.

Plaintiffs also assert MCPA claims against Prudential and MGIC in counts V and VI of the complaint.  Plaintiffs allege that Prudential made deceptive statements related to procuring hazard insurance and deceptively failed to disclose that no policy had been issued (paper 1, at 22), and that MGIC failed to disclose that Plaintiffs were not high-risk, although the mortgage insurance premiums were calculated based on high-risk borrowers, and failed to furnish copies of the mortgage insurance policy to Plaintiffs, (paper 1, at 23).  Plaintiffs also claim fraud in counts X and XI (paper 1, at 28-29), and negligence in counts XIX and XX (paper 1, at 34-35), against MGIC and Prudential, based on analogous factual allegations.

These allegations bear a more tenuous relationship to the facts relevant to Plaintiffs' TILA and RESPA claims as originally pled.  MGIC's classification of Plaintiffs' credit risk, and especially Prudential's statements about hazard insurance bear little relationship to whether the AMC, ALS, and AWC either made required disclosures about the loan terms under TILA or adequately

investigated Ms. Powell's complaint.  The statements made at and before the closing are of limited relevance to Plaintiffs' claims against third parties MGIC and Prudential who were not present at the closing.  Thus, it is at best questionable whether there is a common nucleus of operative fact between these claims and Plaintiffs' federal claims.

Regardless of whether supplemental jurisdiction exists, this court elects not to exercise any such jurisdiction under section 1367(c).  The *City of Chicago* factors counsel against exercising jurisdiction and state law issues predominate in any inquiry into the actions and statements of MGIC and Prudential.  There would be no efficiency gain in combining this unrelated litigation with Plaintiffs' RESPA claims that will go forward because there is very little, if any, factual overlap between these claims.  Under these circumstances, as discussed above, federalism, comity, and judicial efficiency weigh strongly in favor of resolving Plaintiffs' state claims against insurers MGIC and Prudential in state court.  The argument for declining supplemental jurisdiction over these claims is stronger than it is as to Plaintiffs' other MCPA, fraud, and negligence claims because the factual relationship between these state claims and the federal claims is weaker.

**B.  Conversion Claims**

Plaintiffs assert two claims for conversion, both alleging that some of the funds collected in the loan closing process and

subsequent escrow payments rightfully belong to them.   In count XII, Mr. Vaughn alleges that MAP, Apple, Johnson, AMC, AWC, and ALS converted $2550 that were allegedly used to cover brokerage service costs.   (Paper 1, at 29).   In count XIII, Ms. Powell and Ms. Wiseman claim that ALS, AMC, and AWC, converted "[f]unds taken from them in escrow for property taxes in excess of property taxes actually paid . . . ."   (Paper 1, at 29).

This court does not have supplemental subject matter jurisdiction over counts XII and XIII.   Both counts relate not to what disclosures were made to Plaintiffs, but to how funds collected at and after the closing were actually used.   Plaintiffs have not alleged any RESPA violation with regard to failure to investigate either property tax payments or brokerage fees. Plaintiffs' TILA claims were based only on whether required disclosures were made to Plaintiffs, not how escrow funds were spent or to whom brokerage fees were paid and what services were performed in return.   Therefore, there is no common nucleus of operative fact between these state claims and the federal claims. There is, at most, some overlap of background facts, but this is insufficient to support supplemental jurisdiction when the operative facts determining liability in the state and federal claims are not closely related. *Lanford v. Prince George's County, Md.*, 175 F.Supp.2d 797, 803 (D.Md. 2001) (quoting *White*, 985 F.2d at 171).   This conclusion provides additional support for declining

36

to exercise jurisdiction over Plaintiffs' other state law claims, because efficiency will be best served if Plaintiffs' state law claims, which arise out of an alleged set of representations made before the closing, are all heard together by the same court. Because this court lacks supplemental jurisdiction over at least these claims, it would be most efficient for all of Plaintiffs' state claims to be heard in state court.

Finally, even if supplemental jurisdiction were present as to counts XII and XIII, it would be appropriate to decline that jurisdiction for the reasons set out above with respect to Plaintiffs' fraud, MCPA, and negligence claims. Like those claims, the conversion claims bear no significant factual relationship to the RESPA claims that will be litigated before this court because they arose at a different time and relate to the conduct of different Defendants.

## C.  Breach of Contract Claims

Plaintiffs assert claims of breach of contract against Prudential in count XIV and against Liberty in count XV. Both counts allege that  Mr. Greentree and some or all of the Defendants present at the closing acted as agents for these insurance companies at that time and created a contract under apparent agency authority between Plaintiffs and one or both insurance companies to provide hazard insurance.  (Paper 1, at 30).  Plaintiffs allege

37

that this contract was breached when neither company covered claims for hurricane damage.  (*Id.*).

These claims are not sufficiently related to Plaintiffs' federal TILA and RESPA claims, as initially pled, to provide this court with supplemental jurisdiction under section 1367(a). Insurance coverage bears no relation to the loan information that Plaintiffs claim Defendants failed to disclose under TILA.  While the background facts of the breach of contract claims and the RESPA claims overlap to some extent, because both relate to the provision of hazard insurance, these claims do not arise from a common nucleus of operative fact.  The breach of contract claims will focus on the apparent agency relationship alleged by Plaintiffs at the closing, and on whether any resulting contract was subsequently breached by Prudential or Liberty.  Plaintiffs' RESPA claims, on the other hand, will be determined based only on the adequacy of the investigation conducted by AMC and AWC into Ms. Powell's complaints regarding hazard insurance coverage, and not according to whether any contract for such coverage was ever created.

Furthermore, even if supplemental jurisdiction for these claims did exist, it would be appropriate to decline to exercise that jurisdiction for the same reasons set forth above with respect to Plaintiffs' other state law claims, due to the tenuous connection between the Plaintiffs' claims and the continuing RESPA claims.

**D.  Conspiracy and Aiding and Abetting Claims**

Finally, Plaintiffs allege in count XXII that Johnson, Apple, and MAP engaged in a civil conspiracy to defraud Plaintiffs through deceptive actions before and at the closing that resulted in higher fees and payments.  In Count XXIII, Plaintiffs allege that the same three Defendants aided and abetted the unlawful deception of Plaintiffs when they "knowingly associated with each other, with said defendants participating in the deceptive and fraudulent mortgage transaction, with each defendant intending by its actions to make said fraud and deception succeed." (Paper 1, at 38).

It is questionable whether these claims are sufficiently factually related to Plaintiffs' federal TILA and RESPA claims to confer supplemental jurisdiction upon this court.  The alleged civil conspiracy and deceptive acts relate to statements made before and at the loan closing. (Paper 1, at 37-38).  It is not clear whether non-disclosure of loan facts required under TILA will be a part of this claim, although it is possible that the alleged non-disclosures contributed to the alleged deception.  It is not necessary to resolve this issue, however, because even if these state law claims arise from the same nucleus of operative fact as Plaintiffs' TILA claims, those claims have been dismissed, and it is appropriate to decline to exercise any supplemental jurisdiction that does exist.

The *City of Chicago* factors favor declining jurisdiction over these claims, and state issues would predominate over federal issues for the same reasons set forth above with respect to Plaintiffs' state fraud, negligence, and MCPA claims.  The state law conspiracy and aiding and abetting claims bear no relationship to Plaintiffs' RESPA claims, which focus only on the adequacy of a subsequent investigation of the transaction by a different party. The state claims would also require joinder of additional Defendants and much broader discovery, and ultimately testimony, into extensive allegations of deception totally unrelated to the federal claims.  Comity and federalism favor a finding that state issues would predominate over federal issues, because the state conspiracy and aiding and abetting claims involve exclusively Maryland Defendants and are factually and legally intertwined with Plaintiffs' other deception-related state law claims, some of which are not within this court's supplemental jurisdiction and can be heard only in state court.  Additionally, the serious questions as to this court's supplemental jurisdiction also weigh in favor of declining to exercise supplemental jurisdiction.  Given the early stage of the litigation, efficiency also would be best served by declining to exercise any supplemental jurisdiction that may exist over these claims.

## VI.  Conclusion

For the foregoing reasons, Plaintiffs' claims against ALS and Plaintiffs' TILA claims in count XXI will be dismissed for failure to state a claim.  Counts II through XX, XXII, and XXIII will be dismissed, except to the extent Plaintiffs claim that AMC and AWC were negligent in responding to the complaint letters, because the court either lacks or declines to exert supplemental jurisdiction over these state law claims, and Plaintiffs will have the opportunity to file these claims in the appropriate Maryland state court.  The motion by AMC and AWC to dismiss count I, Plaintiffs' RESPA claims, will be denied.  A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge